IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

```
WILLIAM A. GUY,              )
                            )
      Plaintiff,             )
                            )        CIVIL ACTION NO.
      v.                     )         2:13cv08-MHT
                            )            (WO)
ALABAMA POWER COMPANY,       )
                            )
      Defendant.             )
```

OPINION AND ORDER

Relying on the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. §§ 4311 et seq., plaintiff William A. Guy brought this lawsuit against defendant Alabama Power Company claiming that he faced illegal discrimination as a result of his deployment overseas as a member of the United States military.[1]  Subject-matter jurisdiction is

---

1. At the pretrial conference on January 29, 2015, Guy stated that he was no longer pursuing a retaliation claim under USERRA.  Guy had also asserted state-law claims, but the court has already dismissed them.  Guy v. Alabama Power Co., 2013 WL 3929858 (M.D. Ala. 2013) (Thompson, J.).

proper under 38 U.S.C. § 4323(b) and 28 U.S.C. § 1331. The case is now before this court on Alabama Power's motion for summary judgment. The motion will be denied.


## I. LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the admissible evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. <u>Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

## II. BACKGROUND

Guy claims that Alabama Power terminated his employment because of his impending deployment overseas with the United States military. The Alabama Power employees directly involved in his termination are <u>Gail Willis</u>, a high-level sales employee; <u>Kevin Grice</u>, Guy's supervisor; <u>Richard Hutto</u>, a vice-president; and <u>Leslie Sanders</u>, another vice-president. The facts that follow are drawn from the evidence taken in the light most favorable to Guy.

Since the early 1990s, Guy has been a member of the Alabama National Guard, which Alabama Power knew when it hired him as an appliance salesperson in 2003. During his time at the company, his military obligation included regular National Guard trainings as well as one extended 17-month absence from 2006-2007 for pre-deployment training and deployment to Iraq.

3

These absences did not prevent Guy from being promoted within Alabama Power.  When Guy was deployed to Iraq, he was a salesperson, a position in which he could easily be replaced while on leave.  During his deployment, the company paid the difference between his military salary and the salary he would have received. Several colleagues also checked on his family while he was away and collected a fund for his son, who fell seriously ill during his deployment.  Soon after his return, Guy was promoted from salesperson to division-sales manager, a high-level management position where he would be much harder to replace. Altogether, between 2003 and 2007, Guy progressed up the ranks of the company, going from a salesperson at a smaller store to a sales manager with authority over 11 stores.

Although Alabama Power promoted Guy, the company did express some hesitations about his extended absences.  After learning of Guy's potential two-year

4

absence in 2006, Guy's immediate supervisor sent an email up the chain of command, lamenting that, "Things just keep getting better and better." Among the recipients of the e-mail was Gail Willis, a high-level sales employee who would contribute to the decision to fire Guy in 2012. Moreover, in July 2007--which was before Guy's return from Iraq in August of that year--Willis instructed Guy's supervisor to select candidates to interview for his position within three weeks in case he decided not to return to the company. Willis did note, however, that she would hate to fill the position if Guy wanted to return. When Guy returned from deployment and asked for 90 days to re-adjust to his family and civilian life before restarting his job, the company refused and instead said that he needed to return in around one month's time. He agreed and did not file any complaint about this incident.

After his promotion in 2007, Guy received positive feedback for his work over the next four-and-a-half years. In every performance review from 2007 through 2011, including the final one done by his supervisor, Kevin Grice, Guy was told that he fully met expectations. Although there was a section to document any unethical behaviors, every review stated that Guy had "clearly demonstrated" the required ethical conduct. Grice even nominated Guy for a leadership-development program in the spring of 2011, and, in May 2012, Guy was put in a leadership position for the Alabama Power team competing in a city-wide rowing race over the summer.

In late May 2012, Guy learned that he once again would be deployed, this time to Afghanistan. He informed his immediate supervisor, Grice; Grice's supervisor, Willis; and other management, including Leslie Sanders, a vice-president to whom Guy did not directly report but who ran the business operations at

many of the offices where Guy headed the appliance-sales teams. At that point, Willis and Grice made plans for another division-sales manager to cover for Guy during his training and deployment.

One month later, Grice and Willis told Guy, for the first time, about concerns over his professional performance and demeanor. Willis raised these concerns after hearing that Richard Hutto, a vice-president at the company, had voiced concerns about Guy's behavior at previous business forums in 2011 and 2012, and subsequently called Hutto to confirm the reports.

In this June 2012 phone conversation, Hutto told Willis about two incidents involving Guy. First, he stated that his executive secretary had complained that, at a March 2011 forum, Guy hugged her in a way that made her feel uncomfortable but she asked Hutto not to tell anyone. Although Alabama Power policy requires reporting all violations of company policy to human resources, Hutto did not notify anyone of this

incident for well over a year.  He also did not report it in a corporate-compliance survey where Alabama Power employees were asked if they knew of any person who had violated company policy.

Second, Hutto also told Willis about a conversation involving Guy that occurred at the March 2012 business forum.    After  a  female  colleague  mentioned  her gynecologist, Guy, who had been drinking, responded, "If anyone is going to see my wife's vagina, I'd assume it would be [her gynecologist]."   Hutto thought the comment  was  inappropriate  and  worried  that  Guy's actions would get Alabama Power sued.   However, Hutto did not report the comment until a May 2012 meeting with human resources.

Around the same time, Willis also called a human resources employee at Alabama Power, who told her that Guy's jokes sometimes bordered on unprofessional and that Guy could be too informal at work functions.  She also noted that Sanders, the vice-president of business

8

operations in Guy's geographical area, had concerns about him. This employee also did not file any complaints about Guy's behavior.

Willis and Grice, without doing any independent investigation into these incidents or talking with Sanders, arranged a June 2012 meeting with Guy, where they told him about the complaints and their concerns over his lack of self-awareness. Guy was surprised at the feedback but did not push back in the meeting. He agreed to write a development plan that all three of them would go over in a follow-up meeting in mid-July. This form of coaching and counseling was considered informal discipline under Alabama Power policy.

Guy sent in his development plan in early July. In this plan, he acknowledged that, "In some social situations I can come across as awkward, impulsive, arrogant, or self-righteous." He also agreed to build relationships with the business team and to stop drinking at company events.

This development plan was never discussed. After the June counseling session, but before the mid-July meeting, Sanders contacted Willis to talk about Guy. Similar to Hutto, Sanders stated that she had been having problems with Guy for nearly a year. In the fall of 2011, soon after Sanders was elevated to her vice-president position, she had a meeting where different managers introduced themselves and gave a quick report. Guy started his report by stating that "selling appliances sucks" and then proceeded to explain why the economic situation made sales difficult. Sanders told Willis that a person "cannot recover" from that type of comment. Additionally, Sanders stated that so many of the employees in her department had complained about Guy's arrogance that she had told them to stop working with him.

Although Sanders's main concern was Guy's work performance, she also stated that Guy made at least one odd comment to her. Soon after the introductory

10

meeting, Guy had an individual meeting with Sanders in her office.   In response to Guy's perception that Sanders was flirting with him he mentioned how "hot" his wife was to show her that he was not interested. Sanders, who maintains she was not flirting in any way, found the comment strange.

The phone call where Sanders relayed this information to Willis took approximately 15 minutes. Sanders explained that she did not report any of these incidents to Guy's supervisors--Grice and Willis--for the eleven months before the phone call because she was focused on reorganizing her new division.

Sanders reported one additional incident following the phone call.   Guy planned on ordering T-shirts for the rowing competition that he had a leadership role in and wanted to order better shirts than the year before. After he sent out an initial email regarding the shirts, one woman approached him and asked him for a size that he believed would fit her tightly.   Based on

this encounter, Guy told Sanders that he planned on ordering some tighter fitting shirts. Sanders responded that all team members should have the same size shirt. While Guy was simply responding to the earlier request of a co-worker who wanted a tighter fitting shirt, Sanders interpreted Guy's comment as sexist. Although she did ask a colleague to work with Guy when ordering the race shirts, she did not remove him from his leadership role.

Willis and Grice decided, following the phone call with Sanders, that, rather than working with Guy on a development plan, they needed a more formal meeting with Sanders to decide on Guy's future. Although they went ahead with the mid-July meeting with Guy, they did not discuss the development plan or tell him about Sanders's call. Instead, they asked open-ended questions about what was occurring in his division and told him they would schedule an additional meeting to do his mid-year review. During this meeting, Guy gave

Willis and Grice his final training and deployment dates for Afghanistan.

In late July 2012, Grice, Willis, Sanders, and several employees who report to Sanders met to discuss Guy.  Sanders framed the meeting with the common theme that Guy does not respond to e-mail or communicate effectively with other employees, and she repeated what she had told Willis on the phone.  Other employees at the meeting then echoed her framing and proceeded to discuss how Guy was not an effective mentor and how he failed to respond to questions in a timely manner.

Following this meeting, Grice and Willis decided to give Guy the option of demotion or resignation.  Even though Grice did not necessarily believe Guy had acted poorly, he said he agreed with the decision because Guy's working relationships had become too difficult. On August 9, 2012, they told Guy that he had the option of being demoted to an appliance-sales-dispatcher position or a commission salesperson, both lower-level,

customer-facing positions.  They gave him four days to make a decision.  On the fourth day, he requested to use his remaining vacation hours to make a decision, but they refused.  The next morning, he left a message with Grice stating that he would not accept either position, but that he was not resigning.  Grice sent a letter confirming Guy's termination at Alabama Power on August 14, 2012. The company then found a permanent replacement for his position.

Guy brought suit against Alabama Power for discrimination under USERRA, and the company now moves for summary judgment.


### III. DISCUSSION

USERRA bars an employer from discriminating against a "person who is a member of ... or has an obligation to perform service in a uniformed service."  38 U.S.C. § 4311.  This provision prohibits the denial of "initial employment, reemployment, retention in

**14**

employment, promotion, or any benefit of employment by an employer on the basis of that membership ... or obligation." Id.

Guy claims discrimination based on his employment in the National Guard. Specifically, he contends that Alabama Power did not want to spend the time and money training a temporary replacement while he was deployed. The court finds that there is a genuine dispute of material fact on this issue.

Congress enacted USERRA "to encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civil careers and employment which can result from such service and to minimize the disruption to the lives of persons performing service in the uniformed services as well as their employers." Dees v. Hyundai Motor Mfg. Alabama, LLC, 605 F. Supp. 2d 1220, 1224 (M.D. Ala. 2009) (Thompson, J.) (quoting 38 U.S.C. § 4301) (internal quotation marks omitted), aff'd, 368 Fed. App'x 49

15

(11th Cir. 2010).   In the legislative history of a predecessor statute to USERRA, it was observed that, "If these young men are essential to our national defense, then certainly our Government and employers have a moral obligation to see that their economic well being is disrupted to the minimum extent possible." H.R.Rep. No. 1303, 89th Cong. (1966), U.S. Code Cong. & Admin. News 1966, p. 2370 (quoted in Monroe v. Standard Oil Co., 452 U.S. 549, 561 (1981)).

USERRA prohibits discrimination in employment if the employee's membership in the armed services "is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership."   38 U.S.C. § 4311(c)(1).   Motivating factor is not the same as sole factor; "[i]nstead, it is one of the factors that a truthful employer would list if asked for the reasons for its decision."   Coffman v. Chugach Support Servs., Inc., 411 F.3d 1231, 1238 (11th Cir. 2005).   The

16

employee must show this motivating factor by a preponderance of the evidence, at which point "the burden shifts to the employer to prove the affirmative defense that legitimate reasons, standing alone, would have induced the employer to take the same adverse action." <u>Id</u>. at 1238-39. (internal quotation marks omitted). The court will first address whether the employee showed that discrimination was a motivating factor and then turn to the affirmative defense.

### A. Motivating Factor

Because discrimination is "seldom open or notorious," circumstantial evidence is often "critical" in a plaintiff's showing of a motivating factor. <u>Coffman</u>, at 1238 (quoting <u>Sheehan v. Dep't of the Navy</u>, 240 F.3d 1009, 1013 (Fed. Cir. 2001)). To evaluate circumstantial evidence of discrimination in USERRA cases, courts consider a variety of circumstances including:

17

> "[i][P]roximity in time between the
> employee's military activity and the
> adverse employment action, [ii]
> inconsistencies between the proffered
> reason and other actions of the
> employer, [iii] an employer's
> expressed hostility towards members
> protected by the statute together with
> knowledge of the employee's military
> activity, and [iv] disparate treatment
> of certain employees compared to other
> employees with similar work records or
> offenses."

Id. (quoting Sheehan, 240 F.3d at 1014).   Guy
contends that these first three factors are relevant
here.  Alabama Power disagrees.  The court will address
each in turn.


### i.  Temporal Proximity

In this case, the first factor, temporal proximity,
can be analyzed similarly to the analysis of timing in
a retaliation claim in other contexts.  In a
retaliation claim under Title VII of the Civil Rights
Act of 1964, as amended (42 U.S.C. §§ 1981a & 2000e
through 2000e-17), or the Family and Medical Leave Act

(29 U.S.C. §§ 2601-2654), the court would look to when the protected action (such as reporting discrimination) occurred and then the length of time between the protected action and any adverse-employment action. See, e.g., Hurlbert v. St. Mary's Health Care Sys., 439 F.3d 1286, 1298 (11th Cir. 2006). Here, Guy asserts that he told Alabama Power about his deployment dates and soon thereafter faced an adverse-employment action because of his initial reporting.

In either context, temporal proximity "is generally sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." Hurlbert, 439 F.3d at 1298 (11th Cir. 2006) (reversing grant of summary judgment by district court on a Family and Medical Leave Act retaliation claim based in part on close temporal proximity). Here, Guy let Willis, Grice, and Sanders know about his deployment in May, and, one month later, in June, he received informal discipline in the counseling session. After Guy

19

followed instructions and made a development plan,
Willis and Grice did not even examine it; instead, they
relied on information from Sanders that she had known
for almost a year but had communicated only after Guy
informed her that he was deploying to Afghanistan.
Grice and Willis made the decision to demote Guy in
late July, and, when he refused to accept the demotion,
they fired him in mid-August.  Thus, around two months
elapsed between late May, when Guy informed Grice,
Willis, and Sanders of his deployment, and late July,
when Grice and Willis decided to demote or fire him
partly on Sanders's advice.[2]  Put differently, after

---

2. Alabama Power asserts that three months elapsed
between when Guy told his supervisors that he was
deploying to Afghanistan and when he received the
letter terminating him.  Guy's receipt of the letter of
termination is not the right end-point for measuring
temporal proximity.  Temporal proximity is a factor
used to determine the company's motivation for an
adverse-employment action.  That motivation is best
discerned by when Alabama Power decided to fire Guy
rather than when it informed him of its decision.
Indeed, a company should not be able to avoid the
inference of temporal proximity if it admits to making
a decision about firing an employee and then waits
(continued...)

four years of positive reviews and no reports of
questionable ethics, Guy was fired within just a few
months of telling his supervisors that he would deploy
based on complaints about his behavior that could have
been brought up a year earlier.

Alabama Power contends that the two-month gap
between when Guy informed his supervisors about his
deployment and when they decided to demote or fire him
is too long a period to be probative of a
discriminatory motive.  The court disagrees.  In the
retaliation context, "cases that accept <u>mere</u> temporal
proximity between an employer's knowledge of protected
activity and an adverse employment action as sufficient

---

several months to fire him to avoid liability.  <u>See</u>
<u>Blais v. Bridgewell, Inc.</u>, 2012 WL 2577566, at *8 (D.
Mass. 2012) (Casper, J.) (holding that company cannot
avoid inference from temporal proximity simply by
waiting several months after deciding to fire
plaintiff).  Regardless, even if the court used the
three-month period, the temporal proximity between
Guy's deployment and firing--when considered in light
of the other factors--is probative of Alabama Power's
motive.

evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." <u>Clark Cnty. Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273 (2001) (emphasis added) (internal quotation marks omitted); <u>see also</u> <u>Hurlbert</u>, 439 F.3d at 1298 ("The close temporal proximity between Hurlbert's request for leave and his termination--no more than two weeks ... is evidence of pretext, though probably insufficient to establish pretext <u>by itself</u>.") (emphasis added). Of course, if Guy had had a series of poor reviews, and then was fired a month after telling management of his deployment, this temporal proximity likely would not establish a case by itself. Guy, however, does not contend that temporal proximity, <u>by itself</u>, shows causation. Guy had a series of positive-performance and ethics reviews over four years before he told management about his deployment and then complaints began to surface. Additionally, as explained below, there are significant inconsistencies

22

between Alabama Power's proffered reasons for firing Guy and its other actions.

Alabama Power next argues that temporal proximity is not probative because neither Sanders nor Hutto knew that Guy was deploying when they made their reports to Willis and Grice about his questionable performance and behavior.  As to Sanders, both Grice and Guy testified that Sanders knew about Guy's deployment.  Even though Sanders denies that she knew and Alabama Power claims Grice's testimony was ambiguous, the court takes the evidence in the light most favorable to the plaintiff on summary judgment.  The court thus assumes that Sanders learned of Guy's deployment in May and then reported year-old problems to Willis regarding Guy's performance about a month and a half after learning of his re-deployment.  This timing contributes to an inference of a discriminatory motive.  Hutto, on the other hand, did not know that Guy would be deploying when he raised his concerns with Willis.  While this

23

indicates that Hutto did not have a discriminatory motive, the question becomes how Willis and Grice--who knew of Guy's impending deployment--used Hutto's information in taking an adverse-employment action against Guy.  As discussed below, their use of the information also raises an inference of a discriminatory motive in his firing.

### ii. Inconsistencies Between Proffered Reasons and Other Actions of the Employer

Guy next contends that there are inconsistencies between Alabama Power's proffered reasons for its adverse-employment action--performance deficiencies and inappropriate behavior--and its other actions.  Because an employer can have multiple reasons for an adverse-employment action, the court will address each provided.  See Landolfi v. City of Melbourne, Fla., 515 Fed. App'x 832, 835 (11th Cir. 2013) ("[W]e have concluded that the plaintiff failed to show pretext where, although the employer offered differing

**24**

explanations for its decision, its reasons were not necessarily inconsistent.").

Alabama Power's first proffered reason for deciding to demote Guy was his poor performance.  It points to his "selling appliances sucks" comment when first meeting Sanders and his poor relationship with the people in her department.  Poor performance is a legitimate reason to demote someone; however, several of Alabama Power's actions, taken in the light most favorable to Guy, are inconsistent with this reason.

First, Sanders suggests that Guy had been a serious problem for almost a year, but she did not report any of his performance issues until after she heard about his deployment.  Indeed, if she determined that he could not recover from his initial comment that "selling appliances sucks," a reasonable juror could wonder why she let him recover for at least 11 months. Moreover, taken in the light most favorable to Guy, her response that she was too busy to make a 15-minute

25

phone call rings hollow.  Although it is plausible that she had other priorities, a reasonable juror could conclude that she waited to make the short phone call until after hearing of Guy's deployment because she did not want him in a high-level position when he was deployed. Second, if Guy's relationships were so bad that Sanders instructed the people within her department not to work with him, it seems illogical that she never raised it with his supervisors earlier. Third, Willis and Grice never asked Guy about individual complaints regarding his responsiveness until after they decided to demote him.  While they did ask general questions about his relationships in the mid-July meeting, they did not bring up specific complaints.  Finally, Guy received positive-performance reviews for four years in the same position before these problems came to the surface.  The history of positive-performance reviews, with no indication of potential problems, raises the question of what

happened in the fifth year to change his trajectory so dramatically. In sum, Guy has shown enough inconsistencies with the poor-performance rationale to create a jury question whether it was pretextual.

In addition to poor performance, Alabama Power argues that Guy was demoted for his inappropriate actions and comments. Specifically, it notes his inappropriate hugging of an executive secretary, his comments regarding his wife's gynecologist and appearance, and his discussion with Sanders about tight-fitting T-shirts for the rowing race. Similar to poor performance, inappropriate comments should be taken seriously and are clearly grounds for demotion or termination.

However, Grice and Willis's reaction to Guy's inappropriate comments suggests this reason may also have been pretextual. Grice and Willis heard about the inappropriate hugging and the gynecologist comment in June 2012. In response, they held the counseling

27

session, but did not suspend or fire him for sexual harassment or even begin an investigation into whether Guy was involved in any other incidents.  Additionally, although Sanders took Guy's comments about the T-shirts as inappropriate, she still did not remove him from leadership of the rowing team and downplayed this comment in her deposition as the reason for demoting or firing Guy.  When Grice and Willis did decide on an adverse-employment action, they offered him customer-facing positions, where he still would be able to make inappropriate comments.  Put differently, if the problem was inappropriate comments, putting him in front of customers would not solve it.

In response to Guy's contention that its reasons were pretextual, Alabama Power first argues that a company can have differing reasons for firing an employee as long as they are not inconsistent.  The court agrees as far as it goes.  See Landolfi, 515 Fed. App'x at 835.  Poor performance combined with

inappropriate comments likely provides a sounder basis
for demotion than simply one of these rationales.
Moreover, that Sanders blamed Guy for the bad
relationships between him and other employees while
Grice thought that a change needed to be made
regardless of whether Guy was at fault does not mean
they offered inconsistent explanations.  As discussed
above, the problem is not that there are multiple
legitimate explanations, but that a reasonable juror
could find both reasons offered for Alabama Power's
decision to demote Guy inconsistent with its other
actions.

Alabama Power next argues that Guy's claim of
discrimination amounts to nothing more than an attempt
to drag the court into second guessing a corporation's
legitimate business judgment on its personnel.  It is
true that federal courts "do not sit as a
super-personnel department and it is not [their] role
to second-guess the wisdom of an employer's business

decisions--indeed the wisdom of them is irrelevant--as long as those decisions were not made with a discriminatory motive." <u>Alvarez v. Royal Atl. Developers, Inc.</u>, 610 F.3d 1253, 1266 (11th Cir. 2010).

But, asserting business judgment is not a free pass to avoid court scrutiny of discriminatory actions.   It is important to differentiate between questioning a company's business judgment and questioning whether such judgment was a mask for discrimination, as it appears to have been in this case.[3]   Granted, Alabama

_____

3.   To clarify, the court can provide an example. Consider a company deciding whether to make pens or pencils as a business strategy.   Plaintiff, who is part of a protected class and has a history of good performance reviews, advocates that the company develop pens, which appear to be the better business investment.   Despite the economic indicators, management tells the plaintiff it is going to make pencils and fires the plaintiff for his contrary advice. In a first scenario, the company pursues a pencil strategy and loses a lot of money.   The plaintiff then claims discrimination.   The court would reject such a claim because it is not its role (much less its expertise) to question the business judgment of management even if it turned out to be wrong.   In a second scenario, the company fires the plaintiff, but pursues the pen strategy anyways.   At this point, the (continued...)

Power's rationales that it fired Guy based on poor
performance and inappropriate comments are legitimate
reasons to demote someone, and, even if they were
irrational, it would not matter for purposes of this
suit.  However, as discussed above, Alabama Power's
actions are incongruent with the two business reasons
it provided.  Because discrimination is "seldom open or
notorious," the court considers such incongruence as
circumstantial evidence of a discriminatory motive.
Coffman, 411 F.3d at 1238.

### iii. Employer's Previous Hostility Towards Members of the Military

Guy last contends that Alabama Power has previously
displayed hostility toward him taking military leave.

---

judgment to pursue the pen strategy becomes
relevant--not because of the wisdom of the strategy
(which was likely the right one), but rather because it
is inconsistent with the reason the company gave for
firing the plaintiff.  As explained above, this case
resembles the latter scenario.

Even construed in the light most favorable to him, this factor is neutral.

Guy emphasizes two incidents to show past hostility towards him: the email sent in 2007 lamenting that things just "keep getting better and better" after Guy notified the company of his first deployment; and the company's refusal to give him 90 days after his first deployment before he had to come back to work. While the email seems to express frustration at Guy's long deployment, any suggestion of animus is minimized by Guy's promotion soon after he returned from Iraq.

As to the 90-day period that Guy requested before returning to work, USERRA does provide a person deployed for more than 180 days with 90 days to submit an application for reemployment to the company he worked for pre-deployment. 38 U.S.C. § 4312. Drawing all reasonable inferences in favor of Guy, the court finds that Willis's instruction to have interview candidates selected that could replace Guy several

weeks after he returned indicates she was looking to fill the position before the legally required 90-day period ended. This inference is bolstered by Alabama Power's refusal to allow Guy to have additional time before returning to work to be with his family. Nevertheless, the plain-language of the statute states that a service member has up to 90 days to apply for reemployment. It does not state, and Guy cites no cases to suggest, that a company cannot ask about a person's returning to work before that period ends. Regardless, Willis did not fill the position with someone else; Guy returned to work; and he did not file a USERRA complaint. This episode suggests a lack of sensitivity to Guy's home situation after his deployment but does not, on its own, show widespread animus.

Weighed against these two incidents is Alabama Power's support for Guy's military service in the past. It hired him, knowing he was in the military, made up

33

the difference in salary when he was deployed, and promoted him after he returned. Employees also checked in on his family and collected donations for his son while he was in Iraq.

Although these actions might demonstrate that Alabama Power is generally committed to employees that serve in the military, it does not preclude this claim altogether, as Alabama Power argues. See Gillie-Harp v. Cardinal Health, Inc., 249 F. Supp. 2d 1113, 1120 (W.D. Wis. 2003) (Crabb, J.) ("[T]here is a difference between holding members of the armed services in high esteem and being eager to accommodate a reservist's absences from work .... [A company] is more likely to develop hostility towards an employee's reserve duties after experiencing the inconvenience that those duties can cause to the business."). As noted above, the two incidents regarding Guy's first deployment, the timing of Alabama Power's decision to demote him, and the inconsistent explanations for that decision create a

genuine dispute about whether Guy's deployment was a motivating factor in the decision to demote him.

Additionally, the circumstances related to Guy's 2012 re-deployment are different from those around Guy's prior deployment. When Guy deployed to Iraq in 2006-2007, he was a lower-level sales associate, for which a temporary replacement could be easily found and trained. In contrast, before the deployment at issue, Guy had become a division-sales manager over 11 stores. Although another manager temporarily was going to cover Guy's stores, this would have stretched the manager for a long period of time. Taking the evidence in the light most favorable to Guy, a reasonable juror could conclude that Alabama Power decided to demote Guy to avoid the inconvenience of his training and deployment.

B.  Whether the Same Decision Would Have Been Made

Under USERRA's mixed-motive provision, a defendant may raise the affirmative defense that it would have

fired the plaintiff for "legitimate reasons, standing alone." Coffman, 411 F.3d at 1238-39. This means that, "if the defendant had two reasons for taking an adverse action against the plaintiff, one of them forbidden by the statute and the other not, and the defendant can show that even if the forbidden one had been absent the adverse action would still have been taken, the plaintiff loses." Madden v. Rolls Royce Corp., 563 F.3d 636, 638 (7th Cir. 2009).

As discussed above, there is a genuine dispute of material fact about both of Alabama Power's rationales for deciding to demote Guy. Unlike other mixed-motive cases where this defense has been applied, the company did not restructure during deployment and eliminate the position. See, e.g., Coffman, 411 F.3d at 1239 (noting that the company did not even have the management position that plaintiff sought); Baerga-Castro v. Wyeth Pharm., 2009 WL 2871148, at *11 (D.P.R. 2009) (Gelpi, J.) (finding that company reorganization would have led

to same action against plaintiff regardless of military status).  Nor, based on his performance reviews, did Guy have a long history of documented incompetence before he gave Alabama Power his deployment dates. See, e.g., Madden, 563 F.3d at 638 (finding that plaintiff would have been fired regardless of his military obligations because his work had been "dangerously incompetent"); Marino v. Akal Sec. Inc., 377 Fed. App'x 683, 685 (9th Cir. 2010) (holding that plaintiff would have been fired for drinking on the job as a court-security officer regardless of his military status).  Instead, the inconsistencies Guy points out undercut the affirmative defense. Because genuine disputes of material fact exist as to each proffered reason, the court cannot conclude that a reasonable factfinder would have to find that there is a "legitimate reason" that led to Guy's firing despite the potential discriminatory motive. See Atteberry v. Avantair, Inc., 2009 WL 1615519, at *4 (M.D. Fla. 2009)

(Kovachevich, J.) ("Since discriminatory motive can be inferred from the inconsistent reasons given for Defendant's hiring decision, the Defendant failed to meet [its] burden of showing that Plaintiff was denied reemployment for a legitimate, non-discriminatory purpose."). As such, the court finds that the question of whether Guy would have been fired regardless of his status is a genuine dispute of material fact.

* * *

Based on the factors discussed above, the court concludes that the evidence, taken in the light most favorable to Guy, creates a genuine dispute of material fact over whether his deployment was a motivating factor in Alabama Power's decision to demote or fire him. While it is certainly plausible that Alabama Power decided to demote Guy solely based on inappropriate comments and poor performance, enough evidence has been presented to suggest a different

38

narrative: Guy told the company about his impending deployment, it decided to demote or fire him to avoid finding a temporary fill for his position, and it used complaints about his behavior and performance that suddenly surfaced after four years to do so.  It will be up to a jury to determine what actually occurred.

Accordingly, it is ORDERED that the motion for summary judgment (doc. no. 47), filed by defendant Alabama Power Company, is denied.

DONE, this the 14th day of April, 2015.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE